IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 4:25-CV-00193

| | |
|---|---|
| SHAMAYAH JONES, ISHMILL SMITH, XAVIER DAVIS and DWAYNE HICKS,<br><br>*Plaintiffs*,<br><br>v.<br><br>MARK OAKLEY, in his individual and official capacities; GOBLE LANE, in his individual and official capacities; TOWN OF WARRENTON; and DOES 1 through 10, INCLUSIVE,<br><br>*Defendants*. | **COMPLAINT**<br><br>(Jury Trial Demanded) |

## I. NATURE OF THE CASE

1. In the span of a year, Mark Oakley, a police officer with the Warrenton Police Department in Warrenton, North Carolina, falsely arrested and maliciously prosecuted Shamayah Jones and Ishmill Smith, and without lawful justification tased Ms. Jones, Xavier Davis and Dwayne Hicks a total of eight times.

2. Officer Oakley arrested and charged Ms. Jones and Mr. Smith without probable cause; and he tased Ms. Jones, Mr. Davis and Mr. Hicks even though they posed no threat. All three were detained and immobilized when Officer Oakley tased them: Officer Oakley had pinned Ms. Jones into the front seat of her car where she could not move and was screaming in fear for her life; Mr. Davis was handcuffed in a patrol car; and Mr. Hicks was pinned against his car with both hands visible and later was on his knees with his hands behind his back.

3. Officer Oakley tased them anyway.[1]

4. Officer Oakley's conduct, in addition to violating the Fourth and Fourteenth Amendments to the United States Constitution, amounted to false arrest, malicious prosecution, and assault and battery.

5. But Officer Oakley is not the only liable party in these miscarriages of justice.

6. As this Complaint documents, Officer Oakley's actions were the inevitable outcome of his prior and longstanding pattern of unlawfully threatening, harassing, detaining, macing and using excessive force against Warrenton's citizens—especially its Black citizens like all four Plaintiffs here. The Town of Warrenton and its police chief, Goble Lane, were directly informed of Officer Oakley's actions. Numerous community members, including other police officers and members of Warrenton's Board of Commissioners, had reported Officer Oakley's widespread misconduct to the Town and Chief Lane. Officer Oakley's pattern of police misconduct was so notorious that another Warrenton police officer intentionally avoided responding to Officer Oakley's calls due to his reputation for using excessive force. Despite this knowledge, neither the Town nor Chief Lane took any corrective actions.

7. The Town and Chief Lane instead worked to *protect* Officer Oakley. Chief Lane, for example, once instructed another police officer to alter paperwork related to a separate incident to make it appear Officer Oakley was not at fault. On another occasion, Chief Lane retaliated against two police officers for reporting Officer Oakley's misconduct. Rather than intervene or properly supervise Officer Oakley before others like Plaintiffs were hurt, the Town

---

[1] As the Fourth Circuit has recognized, "[d]eploying a taser is a serious use of force. The weapon is designed to cause . . . excruciating pain." *Estate of Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 902 (4th Cir. 2016) (cleaned up).

and Chief Lane condoned Officer Oakley's misconduct and worked to shield him from repercussion, in violation of the law and the Town's basic duties to Warrenton's citizens.

8. Plaintiffs' injuries were avoidable. But Plaintiffs were injured nonetheless due to inaction by the Town and Chief Lane. This lawsuit seeks to remedy those injuries.

## II. JURISDICTION

9. This Court has original subject-matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a) because the claims arise under the laws of the United States and seek redress for rights guaranteed by the United States Constitution that were deprived under color of state law.

10. This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367. These claims derive from the same nucleus of operative facts and are part of the same case or controversy that give rise to the federal claims.

## III. VENUE

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because (i) a substantial part of the events and omissions giving rise to the claims occurred in this District, and (ii) Defendant Town of Warrenton resides in this District and, upon information and belief, Defendant Mark Oakley and Defendant Goble Lane are both North Carolina residents.

## IV. PARTIES

12. Plaintiff Shamayah Jones ("Plaintiff Jones") is a citizen and resident of Warren County, North Carolina.

13. Plaintiff Ishmill Smith ("Plaintiff Smith") is a citizen and resident of Vance County, North Carolina.

14. Plaintiff Xavier Davis ("Plaintiff Davis") is a citizen and resident of Guilford County, North Carolina.

15. Plaintiff Dwayne Hicks ("Plaintiff Hicks") is a citizen and resident of Warren County, North Carolina.

16. Upon information and belief, Defendant Mark Oakley ("Officer Oakley") is a citizen and resident of Warren County, North Carolina.

17. At the time of the events alleged herein, Officer Oakley was a sworn police officer with the Warrenton Police Department. Officer Oakley's employment with the Warrenton Police Department began on or about January 2018.

18. Officer Oakley is sued in his individual and official capacities as to the state law claims for conduct that was malicious and corrupt. He is therefore not entitled to any public official immunity or governmental immunity that might otherwise shield him from liability. As for Plaintiffs' claims under 42 U.S.C. § 1983, Officer Oakley is sued in his individual capacity for conduct taken under color of state law in violation of the United States Constitution and he is not entitled to any qualified immunity or other immunity that might otherwise shield him from liability. Officer Oakley is also sued for conduct that was fraudulent, malicious and willful or wanton, therefore justifying punitive damages. At all times relevant herein, Officer Oakley acted under the color of state law.

19. Upon information and belief, Defendant Goble Lane ("Chief Lane") is a citizen and resident of Warren County, North Carolina.

20. At the time of the events alleged herein, Chief Lane was a sworn police officer with the Warrenton Police Department and the department's Chief of Police.

21. Chief Lane is sued in his individual and official capacities as to the state law claim for conduct that was malicious and corrupt. He is therefore not entitled to any public official immunity or governmental immunity that might otherwise shield him from liability. As for Plaintiffs' claim under 42 U.S.C. § 1983, Chief Lane is sued in his individual capacity for conduct taken under color of state law in violation of the United States Constitution and he is not entitled to any qualified immunity or other immunity that might otherwise shield him from liability. As for Plaintiffs' *Monell* claim, Chief Lane is sued in his official capacity for his actions as a final decisionmaker for the Town of Warrenton. Chief Lane is also sued for conduct that was fraudulent, malicious and willful or wanton, therefore justifying punitive damages. At all times relevant herein, Chief Lane acted under the color of state law.

22. Defendant Town of Warrenton ("Warrenton" or "Town") was, at all times relevant herein, a municipal corporation duly organized and existing under the laws of North Carolina that was acting under the laws of North Carolina. Defendant Warrenton hired, trained and supervised Officer Oakley and Chief Lane to carry out their duties on behalf of the Town as police officers with the Warrenton Police Department ("WPD") (and, in Chief Lane's case, as the WPD Chief of Police). Warrenton is sued under state law claims for the conduct of its employees for which the Town is liable under *respondeat superior*. Warrenton is also sued directly for its own conduct under (i) a state law negligence claim, and (ii) under federal law 42 U.S.C. § 1983 claims for which the Town is liable under *Monell*. Warrenton has waived immunity for liability for the state law claims by the purchase of commercial liability insurance. Accordingly, Warrenton has waived any claim of governmental and sovereign immunity with respect to this action. Warrenton is not immune from the federal law claims.

23. Plaintiffs are ignorant of the true names and capacities of the Defendants sued herein under the fictitious names Does 1 through 10, inclusive. Plaintiffs are informed and believe, and thereon allege, that each of the fictitiously named Defendants is responsible in some manner for the unlawful conduct alleged herein.

## V. FACTUAL BACKGROUND

### A. The Town of Warrenton Knew About and Condoned Officer Oakley's History of Police Misconduct and Excessive Force.

24. Officer Oakley's misconduct dates to his time working as a police officer for the Roanoke Rapids Police Department ("RRPD") in Roanoke Rapids, North Carolina. In 2015, while working for the RRPD, Officer Oakley approached a detainee at the Halifax County Detention Center, slammed him to the ground and tased him. The detainee was in handcuffs and posed no threat.

25. The RRPD Chief of Police at the time, Chuck Hasty ("Chief Hasty"), reported Officer Oakley's use of excessive force to the North Carolina State Bureau of Investigation ("SBI"). Chief Hasty also initiated an RRPD internal affairs investigation regarding the incident. RRPD was preparing to terminate Officer Oakley for this misconduct, but Officer Oakley resigned before the internal affairs investigation could be completed.

26. Chief Hasty indicated on Officer Oakley's exit paperwork that he had been under investigation for the use of excessive force. RRPD also reported the investigation to the North Carolina Department of Justice's Criminal Justice Education and Training Standards Commission ("NCJETS").

27. Following a brief stint as a private security guard, Officer Oakley returned to policing in 2018 as an officer with the Warrenton Police Department ("WPD") in Warrenton, North Carolina.

28. Unfortunately for the citizens of Warrenton, Officer Oakley's misconduct continued in his role with the WPD. He carried out a pattern of harassment against Warrenton's citizens, particularly its Black citizens. This harassment took many forms including the use of excessive force.

29. On June 21, 2020, for example, Officer Oakley, while on patrol with the WPD, detained and threatened three Black individuals in Warrenton without lawful justification. Just prior to this misconduct, Officer Oakley had been pursuing a dirt bike driver in his patrol car. Two Black women at a nearby residence observed the chase as Officer Oakley and the dirt bike driver sped past. One of the women had lost a close friend to a similar police encounter and felt compelled to follow the chase to ensure that Officer Oakley did not harm the dirt bike driver. So the two women decided to follow the chase in their vehicle. They kept their distance.

30. After the dirt bike driver eluded Officer Oakley, he directed his attention to the two women and stopped their car. He approached their car with his hand on his firearm and yelled at the women. Officer Oakley banged aggressively on the car's window and threatened to arrest the women for following him.

31. Meanwhile, Herman Alston, Jr., a respected elder in Warrenton who operates the Heritage Cultural Farm, happened to drive past the encounter between Officer Oakley and the two women. Mr. Alston stopped his pickup truck on the opposite side of the road. He sat in the back of his truck. Mr. Alston was hopeful that his presence as a witness to the encounter might encourage Officer Oakley not to harm the women.

32. Officer Oakley approached Mr. Alston while grabbing his firearm and ordered Mr. Alston to return to the cabin of his truck. Mr. Alston responded that he was simply sitting in the truck bed to observe the scene. Officer Oakley then pulled Mr. Alston from the truck bed and

forced him to the ground, handcuffing Mr. Alston "to teach [him] a lesson to mind his own business."

33. Officer Oakley had no lawful justification for threatening or detaining Mr. Alston and the two Black women.

34. At least three people submitted written complaints to the WPD regarding this incident.

35. On another occasion, Officer Oakley maced three Black women without lawful justification. On March 6, 2021, Officer Oakley, while still working for the WPD, responded to a call about three Black women who were allegedly fighting. By the time Officer Oakley arrived, the women were no longer fighting, and they complied with Officer Oakley's commands. Nevertheless, in keeping with his pattern of harassing the citizens of Warrenton, Officer Oakley maced all three women. On July 7, 2021, all criminal charges against the three women were dismissed.

36. Officer Oakley's misconduct was so widespread and egregious that numerous community members, including other police officers, reported Officer Oakley's actions to Warrenton through its agents including Chief of Police Goble Lane.

37. In 2021, Edna Scott, a former Commissioner on Warrenton's Board of Commissioners who served as Chair of the Public Safety Committee, reported to the Town that multiple individuals had filed complaints with Chief Lane and the Board of Commissioners regarding Officer Oakley's use of excessive force and his harassment and targeting of Black citizens. According to Commissioner Scott, Chief Lane refused to review these citizen complaints and refused to discipline Officer Oakley.

38. In 2023 or thereabouts, at least three Black citizens made complaints to the Town of Warrenton and its agents regarding Officer Oakley's harassment and use of force.

a. Jodeci Boyd reported that Officer Oakley struck her vehicle with a flashlight during a traffic stop, issued a citation to Ms. Boyd without lawful justification and shut a car door on her passenger's legs;

b. Dwayne Macon reported that Officer Oakley targeted and then harassed him for allegedly playing his music too loud; and

c. Shiekel Richardson, who operates a bar in Warrenton, reported that Officer Oakley entered her bar and forced her to close early despite lacking any authority or justification. Ms. Richardson further reported that Officer Oakley would routinely target "individuals of African descent."

39. In 2023, WPD police officers Joseph Ely ("Officer Ely") and Darrell Greene ("Officer Greene") spoke directly with Chief Lane about Officer Oakley's misconduct and repeated use of excessive force. According to these officers, Chief Lane knew about the numerous complaints against Officer Oakley but nevertheless remained firm in his commitment not to train, discipline or terminate Officer Oakley.

40. Chief Lane instead worked to *protect* Officer Oakley. On January 5, 2024, the Warren County District Attorney asked the North Carolina State Bureau of Investigation ("SBI") to investigate complaints against Officer Oakley and his repeated use of excessive force. During that investigation, Officer Greene reported to the SBI that Chief Lane had once instructed him to alter a citation involving an incident where Officer Oakley had been accused of misconduct to make it appear that Officer Oakley was not at fault. Officers Ely and Greene further reported to the SBI that Chief Lane had retaliated against them for reporting Officer Oakley's misconduct.

41. The Town of Warrenton was on direct and constructive notice of Officer Oakley's pattern of targeting and harassing the citizens of Warrenton and using repeated excessive force against them.[2] Despite this knowledge, Warrenton took no corrective actions. Warrenton instead failed to properly supervise Chief Lane regarding Officer Oakley and effectively condoned Officer Oakley's conduct and worked to shield him from repercussion.

**B. History Repeated Itself When Officer Oakley Targeted Plaintiffs and Used Excessive Force Against Them Without Justification.**

42. It is no surprise that the Town and Chief Lane's inaction led Officer Oakley to continue his pattern of misconduct. Over the next several years, Officer Oakley targeted and harassed the named Plaintiffs in this lawsuit and used excessive force against them, all without lawful justification.

43. Plaintiffs are all Black.

*Shamayah Jones and Ishmill Smith*

44. On November 27, 2023, Shamayah Jones ("Plaintiff Jones") and her friend, Ishmill Smith ("Plaintiff Smith"), were organizing a birthday party for Plaintiff Jones' son in Warrenton. Plaintiff Jones asked Plaintiff Smith to accompany her from Warrenton to Henderson to gather supplies for the party. Plaintiff Smith agreed and drove Plaintiff Jones' car. Plaintiff Jones sat in the front passenger seat.

45. As the two drove to Henderson, the dashboard indicated that the tire pressure was low in one of the tires. Plaintiff Smith knew of a nearby air pump at a gas station so he drove to the gas station and pulled up to the air pump, parking in front of it. Plaintiff Jones began teasing Plaintiff Smith, asking whether he even knew how to pump air into a tire.

---

[2] This pattern was so notorious that Officer Ely intentionally avoided responding to Officer Oakley's calls due to his reputation for using excessive force.

46. Meanwhile, Officer Oakley had followed the pair into the gas station and pulled up behind them. He had been sitting in his police squad car in the grass alongside a nearby road when Plaintiff Jones and Plaintiff Smith drove past as they headed to the gas station. Officer Oakley did not observe any traffic violations; nor were the pair speeding. Nevertheless, Officer Oakley pulled onto the road and followed them. He did not activate his patrol car's lights or sirens. Neither Plaintiff Jones nor Plaintiff Smith realized a patrol car was following them.

47. At the air pump, the pair continued to tease one another as Plaintiff Smith stepped out of the car to pump air into the deflated tire. It was only then that Plaintiff Smith suddenly saw Officer Oakley for the first time as the officer approached aggressively with his gun already drawn.

48. As he approached, he demanded that Plaintiff Smith stay in the car. Plaintiff Smith immediately returned to the driver's seat as instructed.

49. Officer Oakley then ordered Plaintiff Smith out of the car and handcuffed him, escorting him to the patrol car. Officer Oakley did not announce his justification for the traffic stop nor his justification for handcuffing and arresting Plaintiff Smith.

50. Officer Oakley had no legal justification.

51. In response, Plaintiff Smith cooperated with Officer Oakley's unlawful commands.

52. During the short walk to the patrol car, Plaintiff Smith expressed his concern for Plaintiff Jones who had just witnessed Plaintiff Smith being handcuffed and arrested without justification. Plaintiff Smith expressed this concern to Officer Oakley, stating, "You're scaring my little cousin [referring to Plaintiff Jones]." In response, Officer Oakley stated, "I don't care about your cousin. I care about me."

53. Officer Oakley detained Plaintiff Smith in the patrol car until later transporting him to the detention center.

54. Officer Oakley, already holding a second pair of handcuffs, then walked back towards Plaintiff Jones who was standing next to her car but was not violating any laws. Officer Oakley said to Plaintiff Jones, “You’re gonna get in your car or you’re gonna get in mine.”

55. Plaintiff Jones complied and retreated backward into the driver’s seat of her car as Officer Oakley grew closer to her. She was recording the encounter with her cell phone in her right hand. Her left hand was visibly empty.

56. Officer Oakley lunged for Plaintiff Jones who responded by pulling her body further into the car. Officer Oakley then changed his commands and, despite having just told Plaintiff Jones to get *into* her car, he commanded that she *exit* the car, lunging at her again.

57. None of Officer Oakley’s commands to Plaintiff Jones were lawful.

58. Plaintiff Jones, who was visibly upset and confused, remained in the driver’s seat while partially reclined across the middle console due to Officer Oakley’s looming presence.

59. Officer Oakley then repeatedly lunged at Plaintiff Jones, grabbing her by the arm in an apparent attempt to pull her out of the car. When this did not work, he attempted the same by grabbing her legs. Officer Oakley repeatedly grabbed and aggressively pulled on her body parts. Plaintiff Jones begged for him to stop.

60. By this point, Plaintiff Jones was fully prone on her back across the middle console while she continued to record the encounter with her cell phone in her right hand. Plaintiff Jones was visibly upset.

61. Officer Oakley then grabbed ahold of Plaintiff Jones’ left wrist and, without letting go, he towered over Plaintiff Jones making it impossible for her to move in any direction

under her own power. He pulled on her wrist as before, but this time he gained enough leverage that he was able to place one handcuff on Plaintiff Jones' left wrist. He then began pulling both the handcuff and the wrist with considerable force in a continued attempt to remove Plaintiff Jones from the car. Plaintiff Jones was trapped and terrified and began to scream in fear.

62. Officer Oakley then unholstered his government-issued Taser, leaned into the vehicle while using Plaintiff Jones' handcuffed wrist as leverage to pull himself closer to her, and pressed the Taser directly into Plaintiff Jones' stomach. Plaintiff Jones continued screaming.

63. Plaintiff Jones was immobilized. Her left hand was cuffed, her right hand continued to record the incident and her body was pinned by Officer Oakley into the car. She did not pose any threat or immediate safety risk to herself, to Officer Oakley or to anyone else. In fact, she could barely move.

64. Nevertheless, within seconds and without any justification or provocation, Officer Oakley tased Plaintiff Jones.

65. The Taser was set to probe mode. In this mode, the Taser fires two large probes at the intended target from a distance. This mode is not intended for close range; the mode is certainly not intended for use while pressed against a person's body. In Plaintiff Jones' case, the Taser fired the two large probes directly into her stomach.

66. The tasing lasted more than five seconds.

67. As the electricity coursed through Plaintiff Jones' body, she let out a haunting scream in a desperate cry for help.

68. Officer Oakley simultaneously yanked Plaintiff Jones out of the car. She crumpled onto the ground, crying out in pain. She landed on the pavement sitting cross-legged while facing the car. She hunched over in pain as she continued to scream and cry.

69. Meanwhile, Officer Oakley maintained control over Plaintiff Jones' left wrist which was still handcuffed. Officer Oakley pulled the handcuff behind Plaintiff Jones' back such that her left wrist was also behind her back. In this position, Plaintiff Jones was immobilized.

70. Officer Oakley then tased Plaintiff Jones a second time. Plaintiff Jones begged for Officer Oakley to stop and repeatedly screamed towards Plaintiff Smith, "He just tased me!"

71. While Plaintiff Jones was on the ground, crying and screaming for help, Officer Oakley handcuffed both of her hands behind her back.

72. Officer Oakley re-holstered his Taser but the prongs remained in Plaintiff Jones' stomach.

73. Officer Oakley then dragged a sobbing Plaintiff Jones to his patrol car. He pressed her against the car as she sobbed against the window while her friend, Plaintiff Smith, screamed in terror from inside the car.

74. A few minutes later, additional officers from the Warrenton Police Department ("WPD") arrived on the scene and placed Plaintiff Jones into one of their patrol cars.

75. Plaintiff Jones was sobbing when two officers approached her in the patrol car. The officers asked how she was doing. She explained that Officer Oakley had tased her. One of the officers exclaimed, "He tased you??? Let me see, let me see." This officer asked Plaintiff Jones whether the taser prongs were still in her body. When Plaintiff Jones said, "Yes," the officer removed the prongs.

76. Meanwhile, the second officer asked, "Are you okay?" This second officer then said, "Can you look at me? Look at me. We're not all like that. It's just him. We're going to get through this together." The officer then apologized.

77. Back in Officer Oakley's patrol car, a third officer spoke with Plaintiff Smith about what had happened. This third officer attempted to comfort Plaintiff Smith. Plaintiff Smith started to cry.

78. The WPD officers then transported Plaintiff Smith and Plaintiff Jones to the detention center. No one ever explained the basis for their detentions and warrantless arrests.

79. Nor did anyone offer any medical assistance to Plaintiff Jones despite that her stomach was bleeding from the Taser prongs.

80. Officer Oakley falsely charged Plaintiffs with the following:

a. Shamayah Jones:

   i. Resisting a Public Officer (N.C.G.S. § 14-223).

b. Ishmill Smith:

   i. Speeding (N.C.G.S. § 20-141(J1)) (alleging Plaintiff Smith was traveling 51 miles per hour in a 35 miles per hour zone);

   ii. Resisting a Public Officer (N.C.G.S. § 14-223).

81. These false charges served to continue these Plaintiffs' detentions.

82. Plaintiff Jones was held for approximately four hours before she was processed and released.

83. Plaintiff Smith was held for approximately nine hours before he was processed and released.

84. On May 13, 2025, the Warren County District Attorney dismissed all charges brought against Plaintiff Jones and Plaintiff Smith arising from their encounter with Officer Oakley on November 27, 2023.

*Xavier Davis*

85. On or about October 30, 2022, Officer Oakley detained and arrested Xavier Davis ("Plaintiff Davis") at a gas station in Warrenton, North Carolina.

86. Officer Oakley handcuffed Plaintiff Davis and placed him in the rear of a patrol car for transport to the detention center.

87. While Plaintiff Davis was handcuffed in the patrol car, Officer Oakley tased him twice—once in the chest and once in the leg.

88. Officer Oakley then transported Plaintiff Davis to the detention center.

89. During processing at the detention center and while Plaintiff Davis remained in handcuffs, Officer Oakley tased Plaintiff Davis a third time.

90. These tasings caused serious physical and non-physical injuries to Plaintiff Davis.

91. Plaintiff Davis did not pose a threat to himself, to Officer Oakley nor to anyone else when he was tased. In fact, Plaintiff Davis was in handcuffs.

*Dwayne Hicks*

92. On September 20, 2023, at approximately 7:30 PM, Dwayne Hicks ("Plaintiff Hicks") was driving through downtown Warrenton, North Carolina. He was headed home when he drove past Officer Oakley who was sitting in his patrol car on the side of the road. Officer Oakley began to follow Plaintiff Hicks.

93. Officer Oakley followed Plaintiff Hicks into a nearby parking lot near the intersection of East Macon Street and Bragg Street in Warrenton. Plaintiff Hicks had pulled into the parking lot and parked his vehicle. Officer Oakley activated his blue lights and positioned his patrol car directly behind Plaintiff Hicks' car. This was the first of two stops that Officer Oakley made of Plaintiff Hicks that evening.

94. Officer Oakley approached Plaintiff Hicks' car and announced that the basis for the stop was that Plaintiff Hicks' headlights were not on. Plaintiff Hicks explained that his car's headlights were working and that just before the traffic stop his headlights were turned on. Plaintiff Hicks further explained that the headlights activate automatically when the car's engine is started. In response, Officer Oakley announced a different reason for the stop—that the *taillights* were not on.

95. At the time of the stop and at all relevant times prior, the headlights and taillights on Plaintiff Hicks' car were working and turned on.

96. Officer Oakley asked Plaintiff Hicks whether he had a driver's license. Plaintiff Hicks assured Officer Oakley that he had a driver's license and showed the front and back of his license to Officer Oakley. Plaintiff Hicks declined to give his license to Officer Oakley because Plaintiff Hicks understood that he only had to display the license.

97. In response, Officer Oakley stated, "Do you want to give me a reason to lock you up?" As he made this statement, Officer Oakley snatched the license out of Plaintiff Hicks' hand and returned to his patrol car.

98. After several minutes, and without offering any warning to Plaintiff Hicks, Officer Oakley approached the rear of Plaintiff Hicks' car and removed the state-issued license plate and accompanying registration tags and placed them in his patrol car.

99. Officer Oakley then issued Plaintiff Hicks a citation for three minor traffic infractions:

a. Operating a Vehicle with No Insurance (N.C.G.S. § 20-313(A));

b. Rear Lamp Violation (taillight) (N.C.G.S. § 20-129(D)); and

c. Impeding Traffic Slow Speed (N.C.G.S. § 20-141(H)).

100. Officer Oakley returned Plaintiff Hicks' driver's license and then read aloud portions of the citation. Contrary to Officer Oakley's citation, Plaintiff Hicks did have auto insurance coverage, and he began to call his auto insurance carrier while explaining this fact to Officer Oakley. But Officer Oakley refused to listen to his explanation and refused to provide any opportunity for Plaintiff Hicks to verify his insurance coverage.[3] Officer Oakley instead threatened Plaintiff Hicks with additional criminal charges.

101. Officer Oakley returned to his squad car and as he drove away, he shouted to Plaintiff Hicks, "You're free to go!" Officer Oakley repeated this multiple times as he passed Plaintiff Hicks who heard the remark. Officer Oakley then traveled down Bragg Street a few blocks where he parked at the corner of Bragg Street and Macon Street.

102. Meanwhile, Plaintiff Hicks drove down Bragg Street toward his home on Hall Street, which is a small street immediately parallel to Bragg Street.

103. Plaintiff Hicks pulled into the driveway of his home on Hall Street.

104. As Plaintiff Hicks exited his car in his own driveway, he noticed Officer Oakley's patrol car parked directly behind him with its blue lights activated. Officer Oakley had again followed Plaintiff Hicks, this time to his home. This was the second stop that Officer Oakley made of Plaintiff Hicks that evening.

105. Officer Oakley approached Plaintiff Hicks with his government-issued service gun already drawn, pointing it at Plaintiff Hicks while yelling for him to remain in his car.

106. Plaintiff Hicks had already exited his car.

---

[3] A true and correct copy of Plaintiff Hicks' auto insurance identification card is attached hereto as **Exhibit A**. As that card shows, Plaintiff Hicks had valid auto insurance coverage for the Toyota 4Runner he was driving when Officer Oakley stopped him on September 20, 2023.

107. Plaintiff Hicks walked slowly towards the rear of his car in the direction of Officer Oakley who also walked slowly towards the same spot. As Officer Oakley continued to approach, he holstered his gun and withdrew his government-issued Taser, pointing it at Plaintiff Hicks. Meanwhile, Plaintiff Hicks, who was holding his cell phone in his left hand and his keys in his right hand, stopped at the rear of his vehicle and began to use his cell phone.

108. Plaintiff Hicks' hands were plainly visible to Officer Oakley who could see that he was holding a phone and keys, and nothing more.

109. Officer Oakley did not explain the basis for this second stop. Instead, upon reaching Plaintiff Hicks, Officer Oakley immediately grabbed Plaintiff Hicks by the back of his right shoulder and shoved Plaintiff Hicks into the rear of his car while demanding that Plaintiff Hicks turn around and place his hands behind his back.

110. The two separated briefly and Plaintiff Hicks placed the keys from his right hand into his pants pocket. Plaintiff Hicks did this calmly and deliberately and then immediately removed his right hand which was visibly empty. Plaintiff Hicks then returned to using his cell phone, this time with both hands. This was all done in Officer Oakley's plain sight.

111. Officer Oakley again told Plaintiff Hicks to place his hands behind his back while pointing the Taser directly at Plaintiff Hicks. At nearly the same time, Officer Oakley closed the small gap between the pair and shoved Plaintiff Hicks against the back of the car. Officer Oakley kept one hand on Plaintiff Hicks' upper back, pinning him against the car. With his other hand, Officer Oakley pressed the Taser into Plaintiff Hicks' lower back.

112. Plaintiff Hicks, while pinned against the car with a Taser pressed into his back, calmly stated, "Oakley." Officer Oakley then tased Plaintiff Hicks. This was the first tasing.

113. Plaintiff Hicks flinched in pain and turned towards Officer Oakley in surprise. Plaintiff Hicks then rested his arms on the car to steady himself. He then resumed standing still, pinned against the car with a Taser pressed into his back.

114. Without warning, Officer Oakley tased Plaintiff Hicks a second time. This tasing was much longer than the first and sent Plaintiff Hicks crashing to the ground where he yelled out in pain.

115. Officer Oakley stood over a disabled Plaintiff Hicks and continued to point the Taser at him. Officer Oakley shouted at Plaintiff Hicks to stay on the ground and place his hands behind his back.

116. At this point, Plaintiff Hicks was seated on the ground, recoiling from the second tasing. Plaintiff Hicks nevertheless attempted to steady himself. Once steadied, Plaintiff Hicks placed his hands behind his back and began to shift to his knees in an attempt to comply with Officer Oakley's commands.

117. Nevertheless, while Plaintiff Hicks was on his knees with his hands behind his back, Officer Oakley tased Plaintiff Hicks a third time while simultaneously shoving him face forward. Plaintiff Hicks fell onto an unpaved portion of the driveway adjacent to his house with his hands still behind his back.

118. While Plaintiff Hicks was lying face first and flat on the ground, Officer Oakley continued to press the Taser into Plaintiff Hicks' back. He then placed handcuffs on Plaintiff Hicks and announced that he would be charged with resisting a public officer.

119. Plaintiff Hicks responded, "I can't believe you did that."

120. Officer Oakley then transported Plaintiff Hicks to the detention center.

121. Officer Oakley charged Hicks with the following offenses related to the second stop:

a. Driving Without Displaying a Registration Plate Number (N.C.G.S. § 20-111(1)); and

b. Resisting a Public Officer (N.C.G.S. § 14-223).

122. During the entire course of events between Officer Oakley and Plaintiff Hicks, and specifically during the three tasing incidents just described, Plaintiff Hicks never posed any threat or immediate safety risk to himself, to Officer Oakley or to anyone else.

123. On November 28, 2023, the Warren County District Attorney dismissed the three minor traffic infractions stemming from the first stop.

124. On March 4, 2024, the Warren County District Attorney dismissed the two criminal charges stemming from the second stop.

125. All charges brought by Officer Oakley against Plaintiff Hicks stemming from their encounter on September 20, 2023 have been dismissed.

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Violation of 42 U.S.C. § 1983 Against Officer Oakley for Use of Excessive Force Under the Fourth and Fourteenth Amendments)

126. Plaintiffs re-allege and incorporate the preceding paragraphs as if set forth herein.

127. Plaintiffs Shamayah Jones, Xavier Davis and Dwayne Hicks bring this claim against Officer Oakley in his individual capacity as a police officer with the Warrenton Police Department.

128. This claim is brought pursuant to 42 U.S.C. § 1983 for violations of rights protected by the Fourth Amendment and the Fourteenth Amendment to the United States

Constitution. Specifically, this claim is brought under the Fourth Amendment (which applies to the actions of Officer Oakley under the Fourteenth Amendment); and this claim is brought as an independent, standalone claim under the Fourteenth Amendment.

129. All actions complained of herein were taken under color of state law for purposes of 42 U.S.C. § 1983.

130. Officer Oakley grabbed and pulled Plaintiff Jones' arms and legs and handcuffed wrist and then tased her in probe mode from point-blank range causing two probes to lodge into Plaintiff Jones' stomach where she bled. Officer Oakley then tased Plaintiff Jones again while she sat immobilized on the pavement.

131. Officer Oakley tased Plaintiff Davis three times while he was handcuffed and detained—twice in a patrol car and once at the detention center.

132. Officer Oakley tased Plaintiff Hicks twice in his back and a third time while Plaintiff Hicks was on his knees, and then Officer Oakley shoved Plaintiff Hicks face forward into the ground.

133. Officer Oakley carried out these applications of force with no legal justification, constituting excessive force under the Fourth and Fourteenth Amendments.

134. Neither Plaintiff Jones, Plaintiff Davis nor Plaintiff Hicks posed any threat or immediate safety risk to themselves, to Officer Oakley or to anyone else to justify the applications of force.

135. These applications of force were neither accidental nor isolated. They were part of Officer Oakley's longstanding pattern of targeting Warrenton's citizens—especially its Black citizens—and that pattern was condoned by the Town.

136. These applications of force caused serious injury to Plaintiff Jones, Plaintiff Davis and Plaintiff Hicks.

137. Plaintiff Jones, Plaintiff Davis and Plaintiff Hicks seek compensatory damages and all other damages permitted by law for the injuries suffered due to Officer Oakley's violations of their rights under the Fourth and Fourteenth Amendments.

138. Plaintiff Jones, Plaintiff Davis and Plaintiff Hicks also seek punitive damages to the extent allowed by law against Officer Oakley for his actions that were malicious, willful and wanton.

139. Plaintiff Jones, Plaintiff Davis and Plaintiff Hicks also seek costs and attorneys' fees to the extent allowed by law, including pursuant to 42 U.S.C. § 1988.

## SECOND CLAIM FOR RELIEF
## (Assault and Battery and Negligence Against Officer Oakley and the Town of Warrenton)

140. Plaintiffs re-allege and incorporate the preceding paragraphs as if set forth herein.

141. Plaintiffs Shamayah Jones and Dwayne Hicks bring these claims under state law against Officer Oakley in his individual capacity and in his official capacity as a police officer with the Warrenton Police Department.

142. Plaintiff Xavier Davis brings these claims under state law against Officer Oakley in his individual capacity as a police officer with the Warrenton Police Department.

143. At the time of his actions as alleged herein, Officer Oakley was acting as an employee and agent of the Warrenton Police Department and the Town of Warrenton and within the course and scope of his official employment with those entities. Officer Oakley was on duty and was assigned to carry out his lawful duties which he failed to do.

144. Officer Oakley's use of excessive force against Plaintiff Jones, Plaintiff Davis and Plaintiff Hicks constituted assault and battery.

145. These applications of force were neither accidental nor isolated. They were part of Officer Oakley's longstanding pattern of targeting Warrenton's citizens—especially its Black citizens—and that pattern was condoned by the Town.

146. Further, in using excessive force against Plaintiff Jones, Plaintiff Davis and Plaintiff Hicks, Officer Oakley acted maliciously, corruptly, fraudulently, willfully and wantonly, and acted without these Plaintiffs' consent. In doing so, Officer Oakley caused serious injury to Plaintiff Jones, Plaintiff Davis and Plaintiff Hicks.

147. In the alternative, Officer Oakley used excessive force against Plaintiff Jones, Plaintiff Davis and Plaintiff Hicks negligently.

148. Plaintiff Jones and Plaintiff Hicks also bring these claims against the Town of Warrenton as the principal of its agent, Officer Oakley, under *respondeat superior*. The Town has waived immunity for these claims and for claims brought against it that arise from the conduct of its agents who, like Officer Oakley here, act within the scope of their employment.

149. Plaintiff Jones and Plaintiff Hicks seek compensatory damages and all other damages permitted by law from Officer Oakley and the Town.

150. Plaintiff Davis seeks compensatory damages and all other damages permitted by law from Officer Oakley.

151. Plaintiff Jones, Plaintiff Davis and Plaintiff Hicks also seek punitive damages against Officer Oakley for his actions that were malicious, willful and wanton.

**THIRD CLAIM FOR RELIEF**
**(Violation of 42 U.S.C. § 1983 Against Officer Oakley for False Arrest Under the Fourth Amendment)**

152. Plaintiffs re-allege and incorporate the preceding paragraphs as if set forth herein.

153. Plaintiffs Shamayah Jones and Ishmill Smith bring this claim against Officer Oakley in his individual capacity as a police officer with the Warrenton Police Department.

154. This claim is brought pursuant to 42 U.S.C. § 1983 for violation of rights protected by the Fourth Amendment. A false arrest claim under the Fourth Amendment requires evaluating whether the officer had objective probable cause for the arrest based on "the totality of the circumstances known to the officer at the time of the arrest."

155. At the time he arrested Plaintiff Jones and Plaintiff Smith, Officer Oakley did not have objective probable cause to justify the arrests.

156. Officer Oakley did not have warrants for these arrests.

157. Officer Oakley did not observe any traffic violations. Plaintiff Jones and Plaintiff Smith were not speeding when they passed Officer Oakley.

158. Plaintiff Jones did not resist, delay or obstruct Officer Oakley under N.C.G.S. § 14-223.

159. Plaintiff Smith did not resist, delay or obstruct Officer Oakley under N.C.G.S. § 14-223.

160. Officer Oakley fabricated the alleged speeding violation as a pretext to conduct the traffic stop and attempted to arrest Plaintiff Jones and Plaintiff Smith on that basis. In response, Plaintiff Jones exercised her legal right not to comply with this unlawful restraint on her liberty. Plaintiff Smith did cooperate with Officer Oakley's unlawful commands.

161. Officer Oakley knew these facts as he witnessed them firsthand. Officer Oakley thus knew the arrests were unauthorized.

162. Officer Oakley nevertheless arrested Plaintiff Jones and Plaintiff Smith despite the lack of objective probable cause and without any legal justification, constituting unreasonable seizures and false arrests under the Fourth Amendment.

163. These false arrests were neither accidental nor isolated. They were part of Officer Oakley's longstanding pattern of targeting Warrenton's citizens—especially its Black citizens—and that pattern was condoned by the Town.

164. These false arrests caused serious injury to Plaintiff Jones and Plaintiff Smith.

165. Plaintiff Jones and Plaintiff Smith seek compensatory damages and all other damages permitted by law for the injuries suffered due to Officer Oakley's violations of their rights under the Fourth Amendment.

166. Plaintiff Jones and Plaintiff Smith also seek punitive damages to the extent allowed by law against Officer Oakley for his actions that were malicious, willful and wanton.

167. Plaintiff Jones and Plaintiff Smith also seek costs and attorneys' fees to the extent allowed by law, including pursuant to 42 U.S.C. § 1988.

**FOURTH CLAIM FOR RELIEF**
**(False Arrest Against Officer Oakley and the Town of Warrenton)**

168. Plaintiffs re-allege and incorporate the preceding paragraphs as if set forth herein.

169. Plaintiffs Shamayah Jones and Ishmill Smith bring this claim under state law against Officer Oakley in his individual capacity and in his official capacity as a police officer with the Warrenton Police Department.

170. At the time of his actions as alleged herein, Officer Oakley was acting as an employee and agent of the Warrenton Police Department and the Town of Warrenton and within the course and scope of his official employment with those entities. Officer Oakley was on duty and was assigned to carry out his lawful duties which he failed to do.

171. At the time he arrested Plaintiff Jones and Plaintiff Smith, Officer Oakley did not have objective probable cause to justify the arrests.

172. Officer Oakley did not have warrants for these arrests.

173. Officer Oakley did not observe any traffic violations. Plaintiff Jones and Plaintiff Smith were not speeding when they passed Officer Oakley.

174. Plaintiff Jones did not resist, delay or obstruct Officer Oakley under N.C.G.S. § 14-223.

175. Plaintiff Smith did not resist, delay or obstruct Officer Oakley under N.C.G.S. § 14-223.

176. Officer Oakley fabricated the alleged speeding violation as a pretext to conduct the traffic stop and attempted to arrest Plaintiff Jones and Plaintiff Smith on that basis. In response, Plaintiff Jones exercised her legal right not to comply with this unlawful restraint on her liberty. Plaintiff Smith did cooperate with Officer Oakley's unlawful commands.

177. Officer Oakley knew these facts as he witnessed them firsthand. Officer Oakley thus knew the arrests were unauthorized.

178. Officer Oakley nevertheless arrested Plaintiff Jones and Plaintiff Smith despite the lack of objective probable cause and without any legal justification, constituting a false arrest under state law.

179. These false arrests were neither accidental nor isolated. They were part of Officer Oakley's longstanding pattern of targeting Warrenton's citizens—especially its Black citizens—and that pattern was condoned by the Town.

180. Further, in falsely arresting Plaintiff Jones and Plaintiff Smith, Officer Oakley acted maliciously, corruptly, fraudulently, willfully and wantonly. In doing so, Officer Oakley caused serious injury to Plaintiff Jones and Plaintiff Smith.

181. Plaintiff Jones and Plaintiff Smith also bring this claim against the Town of Warrenton as the principal of its agent, Officer Oakley, under *respondeat superior*. The Town has waived immunity for this claim and for claims brought against it that arise from the conduct of its agents who, like Officer Oakley here, act within the scope of their employment.

182. Plaintiff Jones and Plaintiff Smith seek compensatory damages and all other damages permitted by law from Officer Oakley and the Town.

183. Plaintiff Jones and Plaintiff Smith also seek punitive damages against Officer Oakley for his actions that were malicious, willful and wanton.

**FIFTH CLAIM FOR RELIEF**
**(Violation of 42 U.S.C. § 1983 Against Officer Oakley for Malicious Prosecution and Material Fabrications and Omissions Under the Fourth and Fourteenth Amendments)**

184. Plaintiffs re-allege and incorporate the preceding paragraphs as if set forth herein.

185. Plaintiffs Shamayah Jones and Ishmill Smith bring these claims against Officer Oakley in his individual capacity as a police officer with the Warrenton Police Department.

186. These claims are brought pursuant to 42 U.S.C. § 1983 for violation of rights protected by the Fourth and Fourteenth Amendments.

187. Officer Oakley initiated charges against Plaintiff Jones for resisting a public officer under N.C.G.S. § 14-223. Officer Oakley initiated charges against Plaintiff Smith for speeding under N.C.G.S. § 20-141(J1) and for resisting a public officer under N.C.G.S. § 14-223.

188. But as discussed above, these charges were not supported by probable cause.

189. Officer Oakley knew this fact but nevertheless initiated, instituted and participated in pursuing these charges; and in doing so, he acted with malice.

190. The magistrate judge entered the charges, thereby causing the unreasonable seizures of Plaintiff Jones and Plaintiff Smith to continue.

191. Moreover, when initiating these charges and presenting them to the magistrate judge, Officer Oakley fabricated and omitted material information. Among other fabrications and omissions, Officer Oakley falsely alleged that Plaintiff Smith had been speeding and falsely alleged that Plaintiff Jones and Plaintiff Smith had failed to comply with lawful orders and had otherwise unlawfully resisted arrest.

192. These fabrications and omissions caused the magistrate judge to issue warrants against Plaintiff Jones and Plaintiff Smith and caused the District Attorney to pursue prosecutions against them.

193. Neither the magistrate judge nor the District Attorney would have permitted these prosecutions to proceed had they known of the fabrications and omissions.

194. The criminal proceedings terminated in favor of Plaintiff Jones and Plaintiff Smith when all charges stemming from their encounter with Officer Oakley on November 27, 2023 were dropped.

195. These malicious prosecutions, fabrications and omissions caused serious injuries to Plaintiff Jones and Plaintiff Smith.

196. Plaintiff Jones and Plaintiff Smith seek compensatory damages and all other damages permitted by law for the injuries suffered due to Officer Oakley's violations of their rights under the Fourth and Fourteenth Amendments.

197. Plaintiff Jones and Plaintiff Smith also seek punitive damages to the extent allowed by law against Officer Oakley for his actions that were malicious, willful and wanton.

198. Plaintiff Jones and Plaintiff Smith also seek costs and attorneys' fees to the extent allowed by law, including pursuant to 42 U.S.C. § 1988.

## SIXTH CLAIM FOR RELIEF
## (Malicious Prosecution Against Officer Oakley and the Town of Warrenton)

199. Plaintiffs re-allege and incorporate the preceding paragraphs as if set forth herein.

200. Plaintiffs Shamayah Jones and Ishmill Smith bring this claim under state law against Officer Oakley in his individual capacity and in his official capacity as a police officer with the Warrenton Police Department.

201. At the time of his actions as alleged herein, Officer Oakley was acting as an employee and agent of the Warrenton Police Department and the Town of Warrenton and within the course and scope of his official employment with those entities. Officer Oakley was on duty and was assigned to carry out his lawful duties which he failed to do.

202. Officer Oakley initiated charges against Plaintiff Jones for resisting a public officer under N.C.G.S. § 14-223. Officer Oakley initiated charges against Plaintiff Smith for speeding under N.C.G.S. § 20-141(J1) and for resisting a public officer under N.C.G.S. § 14-223.

203. But as discussed above, these charges were not supported by probable cause.

204. Officer Oakley knew this fact but nevertheless initiated, instituted and participated in pursuing these charges; and in doing so, he acted with malice.

205. The magistrate judge entered the charges, thereby causing the unreasonable seizures of Plaintiff Jones and Plaintiff Smith to continue.

206. The criminal proceedings terminated in favor of Plaintiff Jones and Plaintiff Smith when all charges stemming from their encounter with Officer Oakley on November 27, 2023 were dropped.

207. These malicious prosecutions were neither accidental nor isolated. They were part of Officer Oakley's longstanding pattern of targeting Warrenton's citizens—especially its Black citizens—and that pattern was condoned by the Town.

208. These malicious prosecutions caused serious injury to Plaintiff Jones and Plaintiff Smith.

209. Plaintiff Jones and Plaintiff Smith also bring these claims against the Town of Warrenton as the principal of its agent, Officer Oakley, under *respondeat superior*. The Town has waived immunity for this claim and for claims brought against it that arise from the conduct of its agents who, like Officer Oakley here, act within the scope of their employment.

210. Plaintiff Jones and Plaintiff Smith seek compensatory damages and all other damages permitted by law from Officer Oakley and the Town.

211. Plaintiff Jones and Plaintiff Smith also seek punitive damages against Officer Oakley for his actions that were malicious, willful and wanton.

**SEVENTH CLAIM FOR RELIEF**
**(Violation of 42 U.S.C. § 1983 Against Chief Lane and the Town of Warrenton for Failure to Supervise Officer Oakley)**

212. Plaintiffs re-allege and incorporate the preceding paragraphs as if set forth herein.

213. Plaintiffs Shamayah Jones, Ishmill Smith, Xavier Davis and Dwayne Hicks bring this claim against Chief Lane in his individual capacity as a police officer with the Warrenton Police Department and the department's Chief of Police. These Plaintiffs also bring this claim

against the Town of Warrenton under *Monell*. For purposes of this claim, Chief Lane and the Town of Warrenton are referred to collectively as the "Supervisory Defendants."

214. Officer Oakley's conduct—in falsely arresting and maliciously prosecuting Plaintiffs and using excessive force against them as described above—violated the constitutional rights afforded to Plaintiffs by the Fourth Amendment and the Fourteenth Amendment. This claim is brought pursuant to 42 U.S.C. § 1983 for the violation of these rights.

215. Defendant Town of Warrenton, through its agents like Chief Lane, had exclusive control over the supervision of Officer Oakley as a police officer with the Warrenton Police Department. The Supervisory Defendants had a duty to adequately and effectively supervise, train, discipline and, if necessary, terminate Officer Oakley and to otherwise stop his unlawful conduct. This included the duty to protect Warrenton's citizens, including Plaintiffs who are all Black, from violations of their Fourth and Fourteenth Amendment rights by Officer Oakley.

216. The Supervisory Defendants breached these duties.

217. The Supervisory Defendants had actual or constructive knowledge that Officer Oakley was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like Plaintiffs.

218. Upon information and belief, the Supervisory Defendants were aware that Officer Oakley used excessive force in 2015 while working for the Roanoke Rapids Police Department ("RRPD") prior to his employment with the Warrenton Police Department. Specifically, Officer Oakley had approached an RRPD detainee at the Halifax County Detention Center, slammed him to the ground and tased him. The detainee was in handcuffs and posed no threat.

219. At minimum, the Supervisory Defendants had constructive knowledge of this incident. The RRPD Chief of Police at the time, Chuck Hasty ("Chief Hasty"), reported this use

of excessive force to the SBI, reported the RRPD's internal investigation of this use of force on Officer Oakley's exit paperwork from the RRPD, and reported the internal investigation to NCJETS. Each of these reports were available to the Supervisory Defendants when they hired Officer Oakley and during his employment with the Warrenton Police Department. The Supervisory Defendants reviewed these reports or at least should have reviewed these reports when they hired and later supervised Officer Oakley.

220. The Supervisory Defendants were also made aware and had actual knowledge that Officer Oakley had been engaged in a pattern of unlawfully threatening, harassing, detaining, macing and using excessive force against Warrenton's citizens—especially its Black citizens. As described above, the Supervisory Defendants received numerous complaints as early as 2020 regarding Officer Oakley's misconduct. Chief Lane even discussed many of these complaints with the Town and its Board of Commissioners, but he refused to review these citizen complaints and refused to train, discipline, stop or terminate Officer Oakley.

221. The Supervisory Defendants instead worked to *protect* Officer Oakley. In 2023, officers Joseph Ely ("Officer Ely") and Darrell Greene ("Officer Greene") with the Warrenton Police Department spoke directly with Chief Lane about Officer Oakley's misconduct and repeated use of excessive force. Chief Lane responded by: (i) instructing Officer Greene to amend paperwork to make it appear Officer Oakley was not at fault for alleged misconduct; (ii) retaliating against the officers for reporting Officer Oakley's misconduct; and (iii) again failing to train, discipline, stop or terminate Officer Oakley.

222. Officer Oakley's misconduct was so notorious that Officer Ely with the Warrenton Police Department intentionally avoided responding to Officer Oakley's calls due to his reputation for using excessive force.

223. The Supervisory Defendants clearly knew that Officer Oakley's conduct posed a pervasive and unreasonable risk that Plaintiffs' Fourth and Fourteenth Amendment rights might be invaded.

224. Despite their knowledge, the Supervisory Defendants took no corrective actions. They did nothing to train, discipline or terminate Officer Oakley. Nor did the Supervisory Defendants intervene to stop Officer Oakley from targeting and harassing Warrenton's citizens. The Supervisory Defendants instead *condoned* Officer Oakley's conduct and worked to shield him from repercussion.

225. The Supervisory Defendants' failure to supervise, train, discipline, stop or terminate Officer Oakley in the face of the risks his misconduct posed—and their decision instead to condone Officer Oakley's misconduct—were so inadequate as to show deliberate indifference and tacit authorization of Officer Oakley's offensive practices.

226. The Supervisory Defendants' failure to supervise, train, discipline, stop or terminate Officer Oakley—and their decision to condone his behavior—caused (and was the moving force behind) Officer Oakley's misconduct and the resulting constitutional injuries that Plaintiffs suffered.

227. Plaintiffs seek compensatory damages and all other damages permitted by law for the injuries suffered due to the Supervisory Defendants' acts and omissions.

228. Plaintiffs also seek punitive damages to the extent allowed by law against Chief Lane for his actions that were malicious, willful and wanton.

229. Plaintiffs also seek costs and attorneys' fees to the extent allowed by law, including pursuant to 42 U.S.C. § 1988.

**EIGHTH CLAIM FOR RELIEF**
**(Violation of 42 U.S.C. § 1983 Against the Town of Warrenton for Failure to Supervise Chief Lane)**

230. Plaintiffs re-allege and incorporate the preceding paragraphs as if set forth herein.

231. Plaintiffs Shamayah Jones, Ishmill Smith, Xavier Davis and Dwayne Hicks bring this claim against the Town of Warrenton under *Monell*.

232. Officer Oakley's conduct—in falsely arresting and maliciously prosecuting Plaintiffs and using excessive force against them as described above—violated the constitutional rights afforded to Plaintiffs by the Fourth Amendment and the Fourteenth Amendment. This claim is brought pursuant to 42 U.S.C. § 1983 for the violation of these rights.

233. Defendant Town of Warrenton had exclusive control over the supervision of Chief Lane. The Town had a duty to adequately and effectively supervise and train Chief Lane. This included the duty to protect Warrenton's citizens, including Plaintiffs who are all Black, from violations of their Fourth and Fourteenth Amendment rights by Chief Lane's supervisee, Officer Oakley.

234. The Town breached these duties.

235. As discussed above, the Town and Chief Lane had actual or constructive knowledge that Officer Oakley was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like Plaintiffs.

236. The Town also had knowledge as early as 2021 that Chief Lane, in his role as Officer Oakley's supervisor, had received numerous complaints regarding Officer Oakley's use of excessive force and his harassment and targeting of Warrenton's Black citizens. Moreover, the Town knew that Chief Lane refused to review these citizen complaints and refused to supervise, train, discipline, stop or terminate Officer Oakley.

237. Despite this knowledge, the Town took no corrective actions to ensure that Chief Lane would supervise, train, discipline, stop or terminate Officer Oakley.

238. Instead, in the face of Chief Lane's express refusal to review the numerous citizen complaints against Officer Oakley and his express refusal to supervise, train, discipline, stop or terminate Officer Oakley, the Town remained silent, thereby condoning Chief Lane's permissiveness towards Officer Oakley.

239. The Town's failure to supervise or train Chief Lane in the face of the risks posed by Officer Oakley's misconduct—and its decision to condone Chief Lane's permissiveness towards Officer Oakley—was so inadequate as to show deliberate indifference and tacit authorization of Officer Oakley's offensive practices.

240. The Town's failure to supervise or train Chief Lane—and its decision to condone Chief Lane's permissiveness towards Officer Oakley—caused (and was the moving force behind) Officer Oakley's misconduct and the resulting constitutional injuries that Plaintiffs suffered.

241. Plaintiffs seek compensatory damages and all other damages permitted by law for the injuries suffered due to the Town's acts and omissions.

242. Plaintiffs also seek costs and attorneys' fees to the extent allowed by law, including pursuant to 42 U.S.C. § 1988.

**NINTH CLAIM FOR RELIEF**
**(Negligent Hiring, Retention and Supervision**
**Against Chief Lane and the Town of Warrenton)**

243. Plaintiffs re-allege and incorporate the preceding paragraphs as if set forth herein.

244. Plaintiffs Shamayah Jones, Ishmill Smith and Dwayne Hicks bring this claim under state law against Chief Lane in his individual capacity and in his official capacity as a

police officer with the Warrenton Police Department and the department's Chief of Police. The official capacity claim is a direct negligence action against the Town of Warrenton.

245. Plaintiff Xavier Davis brings this claim under state law against Chief Lane in his individual capacity as a police officer with the Warrenton Police Department and the department's Chief of Police.

246. The official capacity direct negligence claim is brought against the Town of Warrenton in the alternative to *respondeat superior*, in the event Officer Oakley was *not* acting within the course and scope of his official employment with the Warrenton Police Department and the Town of Warrenton when he committed the tortious acts against Plaintiffs as alleged herein.

247. Plaintiffs bring this claim against Chief Lane and the Town of Warrenton for negligently hiring, retaining and supervising Officer Oakley.

248. As discussed above, Officer Oakley committed tortious acts involving excessive force (including assault, battery and negligence), false arrest and malicious prosecution that resulted in injuries to Plaintiffs.

249. At the time he committed those tortious acts against Plaintiffs, Officer Oakley was and had been incompetent to carry out the duties of a police officer. As discussed above, Officer Oakley had been engaged in a pattern of unlawfully threatening, harassing, detaining, macing and using excessive force against Warrenton's citizens—especially its Black citizens. This pattern of misconduct predated Officer Oakley's employment with the Warrenton Police Department. During Officer Oakley's prior employment with a different police department in neighboring Halifax County, North Carolina, Officer Oakley, while on duty, slammed a handcuffed detainee to the ground and tased him. This pattern then continued during his

employment with the Warrenton Police Department. Officer Oakley's incompetence may be inferred from this pattern and the constituent specific prior acts detailed in this Complaint.

250. As discussed above, Chief Lane and the Town of Warrenton knew or could have known of Officer Oakley's specific prior acts and requisite incompetence had they used ordinary care in hiring, retaining and supervising Officer Oakley.

251. The Town of Warrenton, through its agents (including Chief Lane and Does), nevertheless hired, retained and supervised Officer Oakley. It is no surprise that his inherent incompetence revealed itself in his encounters with Plaintiffs in much the same manner as it did in his encounters with prior North Carolinians—false arrests, malicious prosecutions and the use of excessive force against unarmed citizens who posed no threat.

252. The Town of Warrenton has waived immunity for this claim and for claims brought against it that arise from the conduct of its agents who, like Chief Lane here, act within the scope of their employment.

253. Plaintiff Jones, Plaintiff Smith and Plaintiff Hicks seek compensatory damages and all other damages permitted by law from Chief Lane and the Town.

254. Plaintiff Davis seeks compensatory damages and all other damages permitted by law from Chief Lane.

255. Plaintiff Jones, Plaintiff Smith, Plaintiff Davis and Plaintiff Hicks also seek punitive damages to the extent allowed by law against Chief Lane for his actions that were malicious, willful and wanton.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following judgment:

A. An Order finding in favor of Plaintiffs on all causes of action alleged herein;

B. The grant of any reasonable request to amend Plaintiffs' Complaint to conform to the discovery and evidence obtained in this lawsuit;

C. Compensatory damages;

D. Punitive damages;

E. An award of attorney's fees and costs and expenses;

F. Any other appropriate relief available in law or equity; and

H. Such other and further relief as this Court may deem just, equitable, or proper.

## VIII. JURY DEMAND

Plaintiffs demand a trial by jury of the claims asserted in this Complaint so triable.

Respectfully submitted this the 13th day of October, 2025.

/s/ Gagan Gupta
Gagan Gupta (NCSB #: 53119)
Email: ggupta@tinfulton.com
Abraham Rubert-Schewel (NCSB #: 56863)
Email: schewel@tinfulton.com
TIN FULTON WALKER & OWEN PLLC
119 Orange Street, Floor 2
Durham, NC 27701
Telephone: (919) 307-8400

*Counsel for plaintiffs Shamayah Jones, Ishmill Smith, Xavier Davis and Dwayne Hicks*